**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DERRICK MACON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 8140** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Derrick Macon seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on October 31, 2008, alleging that he became disabled on October 24, 2007 due to a stroke, heart attack, and "depression[,] mental problems." (R. 140, 143, 160). The SSA denied the applications initially on April 16, 2008, and again upon reconsideration on July 11, 2008. (R. 87-95, 106-13). Plaintiff filed a timely request for hearing and

appeared before Administrative Law Judge Jose Anglada (the "ALJ") on September 20, 2010. (R. 24). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from Anita Lewis, program supervisor for the residential facility where Plaintiff was living at the time, and vocational expert Melissa Benjamin (the "VE"). Shortly thereafter, on November 29, 2010, the ALJ found that Plaintiff is not disabled because he can perform his past work as an assembler. (R. 9-17). The Appeals Council denied Plaintiff's request for review on September 13, 2011, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) improperly weighed the opinions of his treating psychiatrist and the consultative examiners; (2) failed to provide adequate support for the residual functional capacity ("RFC") determination; and (3) made a flawed credibility assessment. As discussed below, the Court agrees that the ALJ's decision is not supported by substantial evidence and must be remanded.

## FACTUAL BACKGROUND[1]

Plaintiff was born on September 30, 1964, and was 46 years old at the time of the ALJ's decision. (R. 26, 155). He has a ninth grade education and past relevant work as a driver for a railroad "transporting service," and an assembler for an office supply company. (R. 28-29, 154, 161).

---

[1] Consistent with Plaintiff's arguments for remand, this opinion primarily addresses Plaintiff's mental as opposed to physical impairments.

A.    **Medical History**

1.    **2008**

On January 31, 2008, Henry Fine, M.D., conducted a Psychiatric Evaluation of Plaintiff for the Bureau of Disability Determination Services ("DDS"), presumably in connection with an earlier application for disability benefits. (R. 252-55). Plaintiff complained of depression and reported that he had been hospitalized in the past for substance abuse and attempted suicide. (R. 252). He told Dr. Fine that he heard his dead brother and sister talking to him, and described feeling sad with low motivation and energy. (*Id.*). Dr. Fine noted that Plaintiff had a difficult time with memory and recall exercises, could not do simple calculations or engage in abstract thinking, and exhibited poor judgment and insight. (R. 254-55). Plaintiff also showed impaired focus, attention span, and concentration, as well as disorientation, flat affect, and sleep disturbance. (R. 255). Dr. Fine diagnosed Plaintiff with "Major Depression, Recurrent, With Psychotic Features"; "Poly Substance Abuse, in Remission"; and "Rule out Organic Brain Syndrome, Secondary to Drug Abuse." (*Id.*).

Nearly nine months later, on October 22, 2008, Plaintiff underwent an assessment to determine whether he qualified to participate in the Metropolitan Family Services ("MFS") program for individuals with mental health problems. (R. 266-75). Plaintiff told Rosa Frias, an MFS Case Manager, that he has "a long history of mental health issues" stemming from "a chain of traumatic life events." (R. 267). His brother and sister both died from overdoses, and Plaintiff had to identify his brother's body at the morgue. (*Id.*). He then started experiencing

nightmares, anxiety, depression, and weight loss, and he isolated himself from other people and activities. (*Id.*). Plaintiff relies on support from his sister and NA/AA sponsors, and expressed a willingness to "do whatever is needed to get better." (R. 274). Ms. Frias concluded that Plaintiff would benefit from individual and group therapy to help with his anxiety and depression. (*Id.*).

The following week, on October 31, 2008, Plaintiff filed the current application for disability benefits.

### 2. 2009

On January 5, 2009, Plaintiff started seeing Morris A. Blount, Jr., M.D., a psychiatrist affiliated with MFS, for depression and medication management. (R. 277-78). Plaintiff reported a "long history of depression," which began with the death of his mother when he was a teenager. He complained of nightmares and flashbacks relating to past gunshot wounds,[2] as well as hypervigilance and insomnia. (R. 277). On examination, Dr. Blount found Plaintiff to be alert, calm, cooperative and coherent, but his mood was "not too good" and he exhibited restricted affect. Dr. Blount diagnosed him with post traumatic stress disorder ("PTSD"), major depression, and chronic pain, and prescribed Seroquel and Cymbalta. (R. 278).

Three days later, on January 8, 2009, Dennis R. Karamitis, S.J., Psy.D., conducted a Formal Mental Status Evaluation of Plaintiff for DDS. (R. 284-87). Plaintiff told Dr. Karamitis that he spends his days watching the news or "a friend

---

[2]  It appears that Plaintiff suffered 4 gunshot wounds in 1990, though the record does not contain supporting medical documentation. (R. 248, 292).

4

comes by and takes me for a ride." (R. 285). He is able to dress, bathe, shave and perform "other activities of daily living," including shopping with his daughter, but his daughter and a friend take care of household chores. He goes to an alcohol and drug rehabilitation program twice a week, and denied needing reminders to shower or take medication. (*Id.*).

Dr. Karamitis described Plaintiff as cooperative and "somewhat pleasant" with no evidence of delusions, paranoia or hallucinations. (R. 286). His mood and affect were "depressed and restricted in range" and his speech was slow, but his cognitive processes were "clear and goal directed," and he was fully oriented. (*Id.*). Compared with the January 2008 exam by Dr. Fine, Plaintiff exhibited good memory and recall, could quickly perform calculations, demonstrated an ability to engage in abstract thinking, and showed reasonable judgment. (R. 286-87). Dr. Karamitis diagnosed him with depressive disorder, NOS (not otherwise specified), and polysubstance abuse in remission, and concluded that he "could usefully participate in the management of his own funds." (R. 287).

A couple weeks later, on January 22, 2009, Carl Hermsmeyer, Ph.D., completed a Psychiatric Review Technique of Plaintiff for DDS. (R. 298-310). Dr. Hermsmeyer found that Plaintiff has a depressive disorder, NOS, that does not meet Listing 12.04. (R. 301). He is mildly restricted in his activities of daily living, but has moderate difficulties in maintaining social functioning, concentration, persistence or pace. (R. 308). The same day, Dr. Hermsmeyer also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (R. 312-14). He determined that Plaintiff is moderately limited in his ability to

understand, remember and carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. 312). Nevertheless, he "retains the mental capacity to perform simple one and two-step tasks at a consistent pace." (R. 314).

When Plaintiff returned to Dr. Blount on February 9, 2009, he was well groomed, coherent and pleasant, with a linear thought process and no hallucinations. He was responding well to the Cymbalta and Seroquel at that time, and reported that he was sleeping well at night, was not having as many nightmares and flashbacks, and had a good appetite. Dr. Blount described Plaintiff's mood as "okay" and his affect as euthymic (normal), and noted that he was alert, oriented, calm and cooperative. (R. 358). At his next appointment on March 9, 2009, Plaintiff told Dr. Blount that he was feeling more stressed because his brother-in-law had been found unconscious with some medical problems. Plaintiff remained well groomed, coherent, pleasant, calm and cooperative, however, with an "okay" mood and affect, linear thought process, and no hallucinations. (R. 356).

On May 11, 2009, Plaintiff told Dr. Blount that he was feeling "a little down," but he was "coping," sleeping well, and "not feeling as depressed." He reported spending his days "doing various things." (R. 355, 382). Dr. Blount observed that Plaintiff was well groomed, coherent, pleasant, calm and cooperative, with good judgment, an "okay" mood and affect, linear thought process, and no hallucinations. (*Id.*). At his next therapy session with Dr. Blount on June 22, 2009, Plaintiff reported sleeping well with no mood swings. He also

denied experiencing any side effects from the medication. Dr. Blount noted that Plaintiff was awake, alert, oriented, calm, cooperative and coherent. His thought process was linear, his mood and affect were "okay," and he was still responding well to the medications. (R. 354).

The following month, on July 1, 2009, Plaintiff's services at MFS were terminated "due to lack of funding." (R. 346). His symptoms increased because he no longer had access to medication, and he was arrested and placed on probation for drug possession. (R. 346). Plaintiff subsequently was readmitted to MFS on November 5, 2009. (R. 346-51). He told Ms. Frias at that time that he went out to parties and other social activities, and spent time with friends on a regular basis. (R. 346). He also reported going to church and family gatherings, and traveling "a lot" because he had obtained a part-time job with a "sound company."[3] (Id.). Ms. Frias indicated that Plaintiff needed help with decreased energy, grief and sleep disturbance, as well as coping skills and behavior norms (due to his recent arrest). (R. 348-49).

On November 16, 2009, Dr. Blount completed a Mental Residual Functional Capacity Assessment of Plaintiff for DDS. He indicated that Plaintiff is markedly limited in all areas of: understanding and memory; sustaining

---

[3]     The accuracy of Ms. Frias's assessment appears to be somewhat questionable. Though Ms. Frias implies that Plaintiff was working for a sound company at the time of her interview, (1) Plaintiff's Work History Report states that he worked there from June 2006 to November 2007 (R. 175), (2) Ms. Frias's October 22, 2008 assessment indicates that Plaintiff worked there "many years ago" (R. 268), and (3) the ALJ determined that Plaintiff has not engaged in substantial gainful activity since October 24, 2007. (R. 11). In addition, Ms. Frias's assessment regarding Plaintiff's social activities is markedly different from Dr. Blount's evaluation later that month. (R. 352).

concentration and persistence; social interaction; and adaptation; except that he is only moderately limited in his ability to: understand, remember and carry out very short and simple instructions; interact appropriately with the general public; and ask simple questions or request assistance. (R. 341, 343). Dr. Blount opined that Plaintiff "continues to have poor concentration, including poor memory, which limits his ability to function meaningfully in a work environment. Also, he continues to have intrusive, unpredictable flashbacks." (R. 344).

On November 30, 2009, Plaintiff told Dr. Blount that he had been "feeling depressed . . . nearly all the time, crying a lot." (R. 352). He was sleeping poorly, unmotivated, and having flashbacks and nightmares. Dr. Blount described Plaintiff as awake, alert, oriented, calm, cooperative and coherent, with an "okay" mood, a slightly restricted affect, linear thinking and no hallucinations. (*Id.*). Plaintiff had responded well to medication in the past, so Dr. Blount again prescribed Cymbalta and Seroquel. (R. 352, 353).

On December 16, 2009, Dr. Blount completed a "Medical Assessment of Condition and Ability to do Work-Related Activities (Mental Impairment)" of Plaintiff for DDS. (R. 339-40). Dr. Blount stated that Plaintiff has suffered from PTSD and major depression for "the past seven years," though Dr. Blount has only been treating him since January 2009. (R. 339). Plaintiff has a restricted affect and poor concentration, his prognosis is "fair," and the medications he takes upset his stomach and make him drowsy and constipated. (R. 339-40). Dr. Blount opined that Plaintiff has limited ability to concentrate, psychomotor slowing and intrusive flashbacks which "interfere with day-to-day functioning."

(R. 340).   He also would be likely to "decompensate if exposed to perceived stress of a routine work setting and schedule."  (*Id.*).

When Plaintiff next saw Dr. Blount on December 28, 2009, he was feeling "a little down" and not sleeping well, but he denied experiencing any side effects from the medications.  As on previous visits, Plaintiff was awake, alert, oriented, calm, cooperative and coherent, with an "okay" mood, slightly restricted affect, linear thinking and no hallucinations.  Dr. Blount concluded that Plaintiff was "having more depressive symptoms" and increased his Cymbalta dosage.  He also prescribed Elavil to help Plaintiff sleep.  (R. 378).

### 3.    2010

On February 11, 2010, Ms. Frias spoke with Plaintiff on the telephone and noted that he was doing "well" without any suicidal ideations, thoughts or plans. At that time, Plaintiff was preparing to transition from the MFS outpatient program to the Community Integrated Living Arrangement ("CILA"), a residential program. (R. 364).  When Ms. Frias met with Plaintiff in person on February 22, 2010, he was "engaged and talkative."  (R. 363).  Plaintiff also met with Dr. Blount on February 22, 2010, and reported feeling "okay" but depressed "at times," and anhedonic.  Though he was sleeping better with the Elavil, he "has some depressive times, lasting a few days at a time." (R. 375).  As usual, Plaintiff was awake, alert, oriented, calm, cooperative and coherent, with an "okay" mood, slightly restricted affect, linear thinking and no hallucinations.  Dr. Blount observed that Plaintiff was still "having more depressive symptoms," however, and again increased his Cymbalta dosage.  (*Id.*).

Plaintiff moved into the CILA program on March 1, 2010, and saw Ms. Frias on March 8, 2010 to report on his mental and emotional state. (R. 366, 367). Plaintiff said that he was doing well at that time and worked with Ms. Frias to identify effective ways to stay focused on recovery. (R. 367). He met with Dr. Blount the same day and reported that he was sleeping well and "not feeling depressed." Plaintiff noticed that the increase in Cymbalta was helping and denied having any side effects from the medication. He remained awake, alert, oriented, calm, cooperative and coherent with an "okay" mood and slightly restricted affect and no hallucinations. Dr. Blount's note again stated that Plaintiff was "having more depressive symptoms," but the doctor did not increase the medication dosage. (R. 374).

Plaintiff "appeared restless" and "melancholic" at his meeting with Ms. Frias on March 25, 2010, likely because he had recently attended his godmother's funeral. (R. 368). By March 29, 2010, however, Plaintiff "appeared to be well." (R. 369). When he saw Dr. Blount that day, he said that he was feeling a little down because of his godmother's death and because a friend's mother was gravely ill. Yet he "did notice that he is not waking [a]s much at night [and] is not having the continuous depressive feelings." The rest of Dr. Blount's report is unchanged from the March 8, 2010 visit. (R. 373).

In the last records from MFS, Plaintiff told Ms. Frias that he was "well" on April 20, 2010, (R. 370), and Dr. Blount found him to be "relatively stable" on May 10, 2010. (R. 372).

**B.     Plaintiff's Testimony**

In a November 26, 2008 Function Report completed in connection with his application for disability benefits, Plaintiff stated that he needs a friend to help him dress, bathe and shave, and the only time he goes outside is when someone takes him.  (R. 183-85).   He never shops or handles money, and he needs reminders to attend appointments and take medication.  (R. 185-86).  He spends his days watching television and listening to music, and indicated that he has "no social life at all" and "barely can make it from day to day."  (R. 187-88).  He also suffers from a lack of attention span, poor comprehension, and problems with concentration, memory, understanding and following instructions.  (R. 188).

At the September 20, 2010 hearing before the ALJ, Plaintiff testified that he stopped working as a driver in 2007 because he lost his license due to unpaid parking tickets.  (R. 31).  He lives in a group home for people who suffer from mental illness, sharing an apartment with one person.[4]  (R. 27, 48).  As part of the residential program, he continues to see Dr. Blount, and works with counselors to address his mood swings and his desire "some days" to be alone and not be bothered by anyone.  (R. 37-38, 51).  Plaintiff stated that he sometimes has trouble with concentration and memory, and he is easily distracted.  (R. 49-50).  Though he is able to walk down the street to the grocery store, his depression medication makes him forgetful so he avoids going out alone.  (R. 39, 41).

---

[4]     It appears that prior to that time, Plaintiff lived with family members.  (R. 61).

**C.    Testimony of Anita Lewis**

Anita Lewis, program supervisor for the CILA program, accompanied Plaintiff to the hearing and testified on his behalf.  Ms. Lewis explained that CILA is designed "to teach people with chronic mental illness the independent living skills necessary[] to live autonomously in the community."  (R. 55).  She met Plaintiff six months before the hearing and interacts with him twice a week for four hours each time.  (R. 53-54).  Ms. Lewis stated that Plaintiff has been diagnosed with major depression and PTSD, and opined that he lacks the skills necessary to live independently, such as maintaining an apartment and creating a budget.  (R. 57, 63).

**D.    Statements from Gerald Hill and Angela Snell**

Plaintiff's cousin Gerald Hill, and his friend Angela Snell both submitted information to DDS on behalf of Plaintiff's application for benefits.  In a November 26, 2008 Function Report – Adult Third Party, Mr. Hill stated that he has known Plaintiff all his life, and though he does not spend much time with him, he does anything Plaintiff "need[s] me to do."  (R. 192).  Mr. Hill has no knowledge as to what Plaintiff does all day because he is "not around when [Plaintiff] wakes up and leaves the house before [Plaintiff] goes to bed."[5]  (*Id.*).  According to Mr. Hill, Plaintiff needs help dressing, bathing, shaving, feeding himself and using the toilet, but he does not need reminders to care for himself or take his medication, and he can pay bills and handle money with help.  (R. 193, 195).  At the same

---

[5]    This statement suggests that Plaintiff was living with Mr. Hill for some period of time, but the record is not clear on this issue.

time, he has trouble understanding, following instructions, completing tasks, and remembering. (R. 194, 196).

Mr. Hill stated that Plaintiff's sister shops for him, and that he does not cook or do any chores. (R. 194-95). Plaintiff only goes outside "when [Mr. Hill] come[s] around," but he interacts with others (mostly on the telephone) and gets along "well" with authority figures. (R. 194-196). Mr. Hill estimated that Plaintiff can pay attention for about 15 minutes, he cannot handle stress, and changes in his routine are "hard for him." (R. 196-97).

Ms. Snell provided information during a telephone interview with a DDS adjudicator on December 16, 2008. She has known Plaintiff for 10 years and checks on him "most days" to help him bathe and dress. (R. 200). Ms. Snell stated that Plaintiff has trouble focusing and concentrating, he is "very depressed" with "crying spells a couple times a week," and he is hard to understand when he talks because his speech is slurred and fast. (*Id.*). He likes people to come visit him, but he also "get[s] quiet and withdrawn at times" and fails to get dressed some days. Ms. Snell described Plaintiff as "very forgetful," and noted that he suffers from headaches that make him "irrational." (*Id.*). He also has "problems sleeping." (*Id.*).

### E.    Vocational Expert's Testimony

Melissa Benjamin testified at the hearing as a VE. The ALJ asked her to consider a hypothetical person of Plaintiff's age, education and past work experience who can: occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk and sit for up to 6 hours in an 8-hour workday; but must avoid

concentrated exposure to fumes, odors, dust, gas, and poor ventilation; cannot be exposed to moving or dangerous machinery; can have only occasional contact with the general public; cannot do any job requiring intense focus or concentration for extended periods; and cannot understand, remember and carry out detailed and complex job instructions. (R. 67). The VE testified that such a person would not be able to perform Plaintiff's past work as a driver, which required that he interact with the public, but he could still work as an assembler. The VE noted that an individual who is off task for more than 15 percent of the workday or absent more than one day a month would not be able to engage in competitive employment. (*Id.*).

## F.   Administrative Law Judge's Decision

The ALJ found that Plaintiff's affective disorder and asthma are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 11-12). With respect to Plaintiff's RFC, the ALJ determined that he has the capacity to perform light work with the following restrictions: he cannot be exposed to concentrations of fumes, odors, dusts, gases or poorly ventilated areas; he cannot work in environments with moving or dangerous machinery; he cannot engage in more than limited contact with the public; he cannot work in an environment requiring intense concentration or attention for extended periods of time; and he cannot understand, remember or carry out detailed or complex job instructions. (R. 13). The ALJ accepted the VE's assessment that a person with this RFC could perform Plaintiff's past work as an assembler. (R. 16-17).

14

In reaching this conclusion, the ALJ gave little weight to Dr. Blount's opinion that Plaintiff has marked limitations in understanding, memory, concentration and persistence, explaining that the treatment records "contain no limitations on [Plaintiff's] ability to perform work and fail to provide any indication that [Plaintiff's] mental problems were a barrier to him working." (R. 15). The ALJ also found it significant that Plaintiff lost his job as a driver "because his license was suspended due to multiple traffic violations," and not due to "health reasons." (*Id.*). With respect to the consultative examiners, the ALJ afforded their opinions "limited weight to the extent that their findings are consistent with the record as a whole." (R. 16). Specifically, the ALJ stated that the examining psychiatrists "did not find that [Plaintiff's] mental problems required any functional limitations." (*Id.*).

In light of this medical evidence, the ALJ discounted the testimony provided by Plaintiff, Mr. Hill and Ms. Snell, as "simply not consistent with the rest of the record." (R. 15). The ALJ did not believe that Plaintiff's stated limitations could be "objectively verified with any reasonable degree of certainty," and described the available medical evidence in that regard as "relatively weak." (R. 14). The ALJ also found the testimony from Mr. Hill and Ms. Snell to be of questionable accuracy and value. First, Mr. Hill and Ms. Snell are not "medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." (R. 15). In addition, the witnesses are not

"disinterested third part[ies]" but individuals with "a natural tendency to agree with" Plaintiff's allegations. (*Id.*).

Based on these findings, the ALJ determined that Plaintiff is not disabled within the meaning of the Social Security Act, and is therefore not entitled to benefits.

## DISCUSSION

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).   In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.   *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).   Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."   *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).   The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled."   *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).   Where the

Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhar*t, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[6] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).  A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

---

[6]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*.  The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## C.    Analysis

Plaintiff argues that the ALJ's decision should be reversed because he: (1) assigned improper weight to the opinions of his treating psychiatrist and the consultative examiners; (2) failed to provide adequate support for the RFC determination; and (3) made a flawed credibility assessment.

### 1.    Weight Afforded to Medical Opinions

Plaintiff first objects to the ALJ's decision to afford "little" or "limited" weight to the opinions of Dr. Blount, Dr. Fine and Dr. Karamitis.  Dr. Blount is Plaintiff's treating psychiatrist, so his opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010).  An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist.  20 C.F.R. § 404.1527(c)(2)-(5).  *See, e.g.*, *Simila*, 573 F.3d at 515.

The opinions of consultative examiners are not entitled to controlling weight, but the ALJ must still decide what weight to give them using the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6).  *Simila*, 573 F.3d at 515; *Shambaugh*

*v. Astrue*, No. 11-976-CJP, 2012 WL 3052327, at *5 (S.D. Ill. July 25, 2012) ("[T]he ALJ was required to evaluate the [consultative examiner's] opinion and to explain his reasons for accepting or rejecting it.").

The ALJ gave little weight to Dr. Blount's opinion on the grounds that it "does not appear to be supported by the treatment records," which contain "no limitations on [Plaintiff's] ability to perform work and fail to provide any indication that [Plaintiff's] mental problems were a barrier to him working." (R. 15). The ALJ also gave "limited weight" to the opinions of Dr. Fine and Dr. Karamitis, stating that the physicians "did not find that [Plaintiff's] mental problems required any functional limitations." (R. 16). The Court finds several problems with this analysis.

First, the ALJ did not discuss or identify any of Dr. Blount's specific treatment notes, or explain how they conflict with his November 2009 Mental RFC Assessment. Defendant is correct that many of Dr. Blount's notes reflect that Plaintiff was alert, oriented, calm, coherent and cooperative, and that he demonstrated linear thinking. (Doc. 23, at 8-9). Yet the ALJ did not cite this as a basis for rejecting the mental RFC. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (an agency's lawyers cannot "defend the agency's decision on grounds that the agency itself had not embraced.").

Nor did the ALJ explain why these or any other findings contradict Dr. Blount's opinion that Plaintiff is markedly limited in his ability to understand, remember, sustain concentration and persistence, interact socially and adapt. (R. 341, 343). In that regard, at least some of Dr. Blount's entries seem to

support these marked limitations. In November and December 2009, for example, Plaintiff was "feeling depressed . . . nearly all the time," "crying a lot," sleeping poorly, experiencing flashbacks, and "having more symptoms of depression." (R. 352-53, 378). In February 2010 he was experiencing "some depressive times, lasting a few days at a time," and was anhedonic. (R. 375). At a minimum, the ALJ should have acknowledged these notes and explained why he discounted them.

Contrary to Defendant's assertion, the absence of specific work restrictions in Dr. Blount's treatment notes is insufficient to justify rejecting his opinion in this case, particularly since Plaintiff was not employed while undergoing therapy. *See, e.g., Eskew v. Astrue*, 462 Fed. Appx. 613, 616 (7th Cir. 2011) (absence of work restrictions in medical records not probative of the plaintiff's credibility where "she was after all unemployed throughout the time in question."). Notably, when DDS asked Dr. Blount to comment on Plaintiff's ability to work, he expressed concern that Plaintiff was likely to decompensate if exposed to the perceived stress of a routine work setting and schedule, and stated that he suffers from intrusive flashbacks. (R. 340). The ALJ did not specifically address these concerns, and the mere fact that Plaintiff lost his driving job in 2007 for reasons unrelated to his mental condition is not evidence that he was thereafter capable of full-time employment. Indeed, Plaintiff was admitted to a residential program for persons with chronic mental illness on March 1, 2010, another fact the ALJ failed to mention. (R. 366).

In addition, it is not accurate to say that neither consultative psychiatrist thought Plaintiff's mental problems required functional limitations. Though Dr. Fine did not complete a separate Mental RFC Assessment of Plaintiff, he did find Plaintiff to have rather severe memory deficits, low energy and motivation, and impaired focus, attention span and concentration. (R. 255). These symptoms are arguably consistent with limitations identified in Dr. Blount's mental RFC, but the ALJ failed to discuss this report or explain how it supports the conclusion that Plaintiff is capable of sustained employment. The second consultative examiner, Dr. Karamitis, reached very different conclusions from Dr. Fine, stating for example that Plaintiff had good memory and recall, and showed reasonable judgment. (R. 286-87). The ALJ should have compared the findings in these two reports and given some indication as to how he weighed them in evaluating Plaintiff's claim of disability.

An ALJ "need not discuss every piece of evidence," but where, as here, he "fails to support h[is] conclusions adequately, remand is appropriate." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ's general citation to all of the records from Dr. Blount, and his cursory reference to the opinions of Dr. Fine and Dr. Karamitis, without any discussion or analysis of their specific findings, is inadequate to build a logical bridge between the evidence and the ALJ's conclusion that Plaintiff can sustain gainful employment.

### 2. RFC and Credibility Determinations

Once the ALJ has given further consideration to the medical opinion evidence in the record, he should then determine whether to make any

modifications to Plaintiff's RFC and, if so, pose an updated hypothetical question to the VE.  If it remains relevant, the ALJ should be sure to explain why Plaintiff cannot engage in more than limited contact with the public, but has no restrictions in his ability to interact with co-workers and supervisors.  (R. 13).  Dr. Blount is the only physician who identified any social limitations at all, and he opined that Plaintiff is both moderately limited in his ability to interact with the public, and markedly limited in his ability to get along with co-workers and accept instructions or criticism from supervisors.  (R. 343).  It is not clear why the ALJ accepted one of these restrictions and disregarded the other.  In addition, it would be useful for the ALJ to clarify the extent to which he adopted Dr. Hermsmeyer's opinion that Plaintiff can only perform "simple one and two-step tasks," (R. 314), and explain how he factored that limitation into Plaintiff's RFC, if at all.

The ALJ should also revisit his credibility assessment, which contains the "meaningless boilerplate" language so heavily criticized by the Seventh Circuit. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).  The ALJ did go on to cite two factors that weigh against Plaintiff's allegations of disabling physical and mental impairments, including that "it is difficult to attribute the degree of limitation to [Plaintiff's] medical condition, as opposed to other reasons."  (R. 14). The Court cannot discern from the decision, however, what those "other reasons" may be.

Finally, the ALJ should provide a more complete explanation for rejecting the statements from Mr. Hill and Ms. Snell regarding Plaintiff's condition.

Contrary to the ALJ's suggestion, "nonmedical sources such as family and friends" are "not expected to have medical training or to be . . . 'disinterested' witnesses." *Guranovich v. Astrue*, No. 09 C 3167, 2011 WL 686358, at *19 (N.D. Ill. Feb. 15, 2011). *See also* SSR 96-7p, 1996 WL 374186, at *8. The ALJ's subsequent assertion that the witnesses' testimony was "simply not consistent with the rest of the record" is lacking in analysis sufficient to demonstrate that the decision is supported by substantial evidence. (R. 15).

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 18) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: October 11, 2012

_____
SHEILA FINNEGAN
United States Magistrate Judge